## Apartment Association of Metropolitan Pittsburgh v. The Municipal Authority of the Borough of West View, Water Department

*Richard F. Rinaldo*, for plaintiff.
*Fred E. Baxter*, for defendant.

SILVESTRI, *J.*, February 19, 1983 — The Apartment Association of Metropolitan Pittsburgh (Association) initiated a class action challenging the method of billing for water service to the representative plaintiffs and the putative class which has been employed by the Municipal Authority of the Borough of West View (Authority).[1] The class which is represented by the Association includes all owners and/or operators of one or more multi-unit buildings located in the service territory of the Authority who, at any time on or after March 30, 1970, and before the entry of final judgment in this action, have received or receive water service from the Authority at the multi-unit buildings through one or more meters or meter installations of one to six inches in size, which serve two or more units of a building.[2]

The action was brought pursuant to §106(B)(h) of the Municipality Authorities Act (Act) which provides that an authority is empowered:

"[t]o fix, alter, charge and collect rates and other charges in the area served by its facilities at reasonable and uniform rates to be determined exclusively by it. . . . * * * Any person questioning the reasonableness or uniformity of any rate fixed by any Authority . . . may bring suit against the Authority in the court of common pleas of the county wherein the project is located. . . . "

The court of common pleas has exclusive jurisdiction to determine all such questions involving rates.

Plaintiffs challenge the rates charged to the class which are determined on a basis other than the rates set forth in the published rate schedules. The published rate schedules establish rates ac-

---

1. The Authority was created under and is subject to the Municipality Authorities Act of 1945 (Act), May 2, 1945, P.L. 382, §1 et seq., 53 P.S. §301, et seq.
2. The class has been certified as such by order of court.

cording to the sizes of the customer's meter, which range from five eighths inch to six inches; however, plaintiffs and the members of the class are charged for water service as though service was being supplied by five eighths inch meters rather than by the actual size of the meter. The latter method of billing is referred to as a multiple minimum method. Plaintiffs contend that the method of billing employed by the authority with respect to plaintiffs and the class members is unlawful, unreasonable, and lacking in uniformity. Plaintiffs assert that the multiple minimum billing method deprives them of the lower gallonage rates provided in the published rate schedules for consumers receiving water service through larger diameter meters. Plaintiffs seek an order of court declaring that the rates are not uniform and are unreasonable. Plaintiffs further request relief in the form of a rebate of the amounts which were unlawfully collected from the plaintiffs and the class members as a result of the billing method.

The action regarding the reasonableness or uniformity of the rates established by the authority was tried before this court on the issue of liability only. By way of stipulation and the testimony presented, it was established tht the Authority has "classified" each of its metered water users as one of the following: (a) residential, (b) commercial, (c) industrial, (d) municipal, or (e) resale. It has been stipulated that the Authority's general practice is to classify multi-unit buildings containing four or more units as commercial units.

The authority bills its customers on either a monthly or quarterly basis. The authority utilizes a type of rate structure for metered water service commonly referred to in the water utility industry as a "declining block rate" schedule. The use of a de-

clining block rate schedule, results in a lower unit cost of water, ordinarily as measured in gallons, as the usage of the volume of water increases. The schedules of rates and service charges which were published by the Authority from 1960 through 1982 indicate facially that the minimum charge for customers was based upon the size of the meter. The size of meters ranged from five eighths inch to six inches. An allowance in gallons and a minimum charge was established for each meter size.[3]

In computing the charge for water service based solely upon the published schedule of rates, reference would be made first to the minimum charge and allowance in gallons for the size of the meter used by a customer. The allowance in gallons would then be subtracted from the customer's actual water use during the billing period. The rates applicable to the usage which exceeded the allowance in gallons were set forth thereafter in the schedules of rates as "meter quantity charges." For example, the schedules of rates for the geographical area referred to as the Basic Project establish charges per thousand gallons for the first 45,000 gallons used, for the next 150,000 gallons, for the next 150,000 gallons, for the next 657,000 gallons, and for the remaining usage over 1,002,000 gallons. The charge per thousand gallons decreases as the usage exceeds each level of gallonage.

The charge for a customer's water usage which exceeds the allowance would be calculated by deducting the allowance in gallons from the quantities set forth above and applying the declining block rates. The total charge for water service would be calculated by adding together the minimum charge

3. See, e.g., Appendix A, which is the Authority's Schedule of Rates and Service Charges, effective date April 1, 1982.

for the size of meter serving the customer and the excess quantity charge. It appears that the Authority computed the charges to each metered customer in accordance with this method until June, 1960.

On March 16, 1960, the authority adopted a method of billing which is referred to as multiple minimum billing. This method of billing was incorporated into the authority's rules and regulations governing water service and was effective June 1, 1960. After the adoption of the multiple minimum method, the charge for water service in all cases where more than one "premise" is served through one meter or meter installation was not calculated by reference to the size of the meter and to the effective schedule of rates, as described above.

The authority's rules and regulations, effective date March 22, 1973, defines the term "customer" in Section I, subsection 2. "Customer" is defined as " . . . the owner or tenant contracting for or using water service on a single *premises* (Emphasis supplied.); and the word 'Customers' means all so contracting for and using service." The definition of the term "customer" as used in this opinion is the authority's definition of "customer".

The rules and regulations define "premises" in Section I, subsection 7 to include:

"a. A building under one roof owned or leased by one customer and occupied as one residence or one place of business; or

"b. A group or combination of buildings owned by one customer, in one common enclosure, occupied by one family or one organization, corporation or firm, as a residence or place of business, or for manufacturing or industrial purposes, or as a hospital, church, public or private school or similar institution, except as otherwise noted herein; or

"c. The one side of a double house having a solid vertical partition wall; or

"d. Each side or each part of a house or building occupied by one family, even though the closet and/or other fixtures be used in common; or

"e. Each apartment, office or suite of offices, and/or place of business located in a building or group of buildings, even though such buidings in a group are interconnected . . . ; or

"f. A public building devoted entirely to public use . . .; or

"g. A single vacant lot or park or playground; or

"h. Each house in a row of houses; or

"i. Each dwelling unit in a row of houses, a dwelling unit being defined as a building or portion thereof with exclusive culinary facilities designed for occupancy and used by one person or one family (household); or

"j. Each individual and separate place of business and/or occupancy located in one building or group of buildings commonly designated as shopping centers, supermarket areas and by such other terms; or

"k. Each dwelling unit in a public housing development owned and operated by the United States of America, a municipal subdivision of the Commonwealth of Pennsylvania, or an agency or instrumentality of the United States or the Commonwealth of Pennsylvania; by a philanthropic foundation or organization or some such similar body or organization; or operated under private ownership; or

"l. Each trailer, whether free standing or located in a trailer park area."

Subsection 7 further provides:

"The charge for water services in all cases where more than one premises is served through one me-

ter or a meter installation (a meter installation being defined as an installation including two or more meters placed at one or more locations for the purpose of serving one or more premises in a building or a related group of buildings, in a facility or related group of facilities, in an area or a related group of areas, and in such other properties; more than one meter generally being provided to allow flexibility of operation, to furnish adequate capacity, to permit more accurate measurement of water, due to the physical layout of the property, and for such other reasons) shall be determined as follows:

"(1)  The average use of water for each billing period for each premises shall be equal to the total number of gallons of water registered by the meter or meter installation divided by the number of premises. The customer or customers shall notify the Authority promptly relative to any changes in the number of premises, the number at any time always being subject to determination by the Authority. The potential number of premises in any building or group of buildings and the charges therefor are subject to determination by the Authority prior to original approval by the Authority to furnish water services, and are subject to determination subsequent to any alterations, additions or changes in the building or group of buildings.

"(2)  The average use of water for each premises, as determined under the foregoing item, shall provide the basis for billing, and the amount of the charge for each premises shall be computed on the basis of a 5/8-inch meter installation, as set forth in the Rate Schedule Governing Water Service; the minimum charge and allowance in gallons for a 5/8-inch meter to apply and the total charge for each premises to be the minimum charge plus charges for all water in excess of the allowance in gallons in accordance with the

Rate Schedule, the excess to be the average use in gallons as determined under (a), minus the quantity allowed for the size of meter. If it be determined that meters larger than ⅝-inch in size would be necessary if each premises were provided with individual service, the charges for each premises will be based on the larger meters.

"(3) The total charge for the water service shall. be equal to the average charge for each premises multiplied by the number of premises, determined as previously set forth; and the total charge shall be submitted to the customer or customers as the proper charge for water service furnished to the type of building and/or buildings included hereunder.

"(4) This regulation shall apply regardless of whether a business may be owned by a customer also receiving household water service through the same meter or the two or more premises are located in one building or in different buildings, the ownership of the property or business not being significant.

"(5) Should the owner desire that the Authority conduct business directly with the tenant of each premises, he must first provide means of controlling the supply and housing of the meter or meters for each premises and/or provide means of billing and collecting the water charges therefor."

The testimony establishes and the parties agree that despite the qualification in paragraph (2) that the charges for each premise will be based on the larger meters if it is determined that meters larger than five eighths inch would be necessary, the authority computes the charges to all multi-unit buildings in its service territory in which more than one premises is served by a single meter or installation, ranging in size from one inch to six inches solely by reference to the five eighths inch meter size. Up to

the time of the trial, no use was made of the administrative discretion under paragraph (2).

The evidence fairly establishes the following facts. The multiple minimum billing method was recommended initially by the consulting engineer and solicitor for the authority. Ronald Spray was employed by the firm of William J. Murdoch Engineers, Inc. from 1952 to 1973. The Murdoch firm was the consultant to the Authority during that time. Spray is currently employed by the Bankson Engineers, the Authority's consultant since 1974. Spray was the individual responsible for the consulting engineering work performed for the authority prior to and during the period of time the multiple minimum billing method was adopted. It is the duty of the consulting engineer to prepare an annual report setting forth recommendations as to any necessary or advisable revision of the rates and charges. Spray took part in devising the formula for the multiple minimum billing method.

Spray testified that he did not study the water use of multi-unit buildings prior to the effective date of the multiple minimum billing method; nor did he remember seeing such a study. Spray testified that he never determined what portion of the costs of providing water service are recovered by the authority from its minimum charges. No study was ever performed by Spray to determine whether or not the costs to the authority were related to the charges established in its declining block rates schedules. Spray further testified that he had never made a determination of the cost to the authority of providing service to any class of users and that no one had ever made such a determination.

No study has been done of the cost of providing service through the various sizes of meters. A study was conducted of the cost to the authority of pro-

ducing water. The study was limited to a determination of the cost per thousand gallons to the authority. The basis for this determination was the total amount of water produced and the total expenses incurred by the Authority. The study did not encompass an allocation of the expenses among the user groups.

No study of the cost to the authority of providing service to multi-unit buildings was undertaken prior to the adoption of the multiple minimum billing formula. Neither William Marcus, the solicitor for the Authority from 1942 to 1975, nor any of the board members of the Authority undertook any study of the advisability of adopting multiple minimum billing.

The input upon which the authority based its adoption of the billing formula was the solicitor's sense that an inequity existed in the rate schedules among similar classes of users. An assumption was made that the demand characteristics of residential users and users in apartment buildings and in other "premises", as defined in the authority's rules and regulations, were similar. Demand characteristics include, inter alia, average demand, daily demand, peak hour demand and seasonal demand. The demand characteristics affect the costs of a water system because the plan facilities must be designed to meet the demands on the system. It appeared to follow from the assumption regarding demand characteristics that a billing formula should be instituted to have similar types of users billed equitably. The multiple minimum billing method had been employed by other clients of Murdoch Engineers and was accepted by the authority's board members.

No reference has been made to the multiple minimum billing method since its inception in any of the published schedules of rates. Applications for water

service which are signed by customers indicate that the application is made subject to the rules and regulations of the Authority. No customer is given a copy of the rules and regulations when an application is completed. If a customer wants a copy, a fee of $25 is charged.[4]

It is the authority's general practice to "classify" multi-unit buildings containing four or more units as a commercial user. The multiple minimum billing method is applied to the single metered multi-unit buildings, but is not applied to other customers who are classified as commercial.[5]

Plaintiffs challenge the authority's rate structure because the multiple minimum billing method, which assesses charges to customers who are receiving water for more than one premise through a single meter, is not based upon the size of the meter servicing the customer.

The standard of review of a rate structure of a municipal authority is ". . . limited to a determination of whether or not there has been a manifest and flagrant abuse of discretion or an arbitrary establish-

---

4. The Authority's office manager testified that the rules and regulations are on display behind the receptionist in the office of the Authority although copies are not distributed to the customers who agree to be subject to those rules and regulations. The receptionist is trained to point out the display. There is no sign in the general office which indicates a fee of $25 is charged. The fee appears only in the rules and regulations. The customers who complete applications for water service at locations other than the general office cannot take advantage of the wall-hanging or the receptionist's training.

5. For example, the use of this method has resulted in a charge of $1,217.61 to a laundromat which used 935,000 gallons of water while an owner of a single-metered multi-unit building was charged $1,409.64 for the use of 764,000 gallons.

ment of the rate system." Patton-Ferguson Joint Authority v. Hawbaker, 14 Pa. Commw. 402, 322 A.2d 783 (1974) (citation omitted.) The burden of proof is on the plaintiffs to establish that the authority has abused its discretion or arbitrarily exercised its power by establishing a rate structure which was either unreasonable or lacking in uniformity.

In Patton-Ferguson, supra, an owner of an apartment building challenged a rate schedule of a municipal authority which provided sewer service to the apartments. The rate schedule stated that a specified charge would be assessed to each dwelling unit. Each residential dwelling unit in a double house, in a row of connecting houses or in an apartment building was billed as a separate unit. The owner challenged the authority's classification of apartments as residential units rather than as non-residential units, for which a lower rate was applicable.

The Commonwealth Court stated, at 786,
". . . The reasonableness of any such classification, however is clearly a matter for administrative discretion. Brown v. Pennsylvania Public Utility Commission, 152 Pa. Super. 58, 31 A.2d 435 (1945). A municipality may create classification of users so long as the charge is uniform within the classification and is reasonably proportional to the service rendered. (Citations omitted). Since all apartments pay the same rate, it is obviously uniform." Glen Riddle Park, Inc. v. Middletown Township and Middletown Sewer Authority, 11 Pa. Commw. 574, 581, 314 A.2d 524, 527 (1974)."

It may appear superficially that the court is confronted with a classification of customers similar to that in Patton-Ferguson; however, the classification which was created by the authority in the present

action is not a classification of users as residential or non-residential. In fact, no classification of users is discernible from the published schedules of rate. The rate schedules refer only to the size of the meter and not to any type of user or classification of user.

Nor do the rules and regulations of the Authority distinguish between residential or non-residential users. As "premises" is defined, users which ordinarily would be classified as residential are included, e.g., "each dwelling unit in a row of houses," and users which ordinarily would be classified as commercial are included, e.g., "each office or suite of offices." The classification of customers is not made according to the use of the service, rather the classifications are of customers whose premise is served through a separate service connection, line and meter and of customers for whom more than one premise is served through one meter or a meter installation. For the customers, whether categorized as residential, commercial or industrial, who are served through a separate meter, the charge is computed by reference to meter size and the applicable rate schedule. Therefore, a customer who is categorized as residential and is served by a separate three fourths-inch meter is charged according to the minimum allowance and charge for a three fourths-inch meter; a residential customer served by a separate five eighths-inch meter is charged according to the minimum allowance and charge for a five eighths-inch meter. A customer such as an owner of a multi-unit apartment building who is categorized as a commercial customer, whose use is residential, and is served, for example, by one two-inch meter is charged according to the multiple minimum billing method rather than the minimum allowance and charges for a two-inch meter.

Similarly, a customer who is categorized as commercial and is served by a separate meter is charged according to the minimum allowance and charge for the size of the meter. A customer, such as an owner of a multi-unit bidding comprised of offices or suites of offices who is served, for example, by one meter of the size of two inches, is charged according to the multiple minimum billing method rather than the minimum allowance and charge for a two-inch meter.

Clearly, the multiple minimum billing method is not employed solely because the demand characteristics of a multi-unit building, such as an apartment building, may be similar to a residential customer. The classification divides customers into two groups of customers: (1) the customer whose property is designated as one or more "premise" and is served by separate meters for each "premise"; (2) the customer whose property is designated as more than one "premise" and is served by a single meter. The first class is charged according to the size of the meter or meters; the second class is charged according to the multiple minimum billing method.

The authority's classification of its customers differs dramatically from the classification of the *types* of users which was employed by the municipal authority in Patton-Ferguson, supra. Although the parties have stipulated that the Authority has classified each of its metered water users as residential, commercial, industrial, municipal or resale, the challenged billing practice does not rely upon the foregoing "classifications" to assess service charges. The type of use has no significance to its billing practice or rate structure. Our review of the Authority's billing method demonstrates that classifications may arise artificially from the billing method itself and not from the Authority's calculated act

of defining the members of a group. We question the validity of applying a principal of administrative discretion regarding the reasonableness of classifications which result from a method of billing rather than from classifictions which are drawn by an authority and to service charges assessed according to those classifications.

We need not violate the mandate of the Commonwealth Court which prohibits the substitution of judicial discretion for administrative discretion, however, to determine the validity.of the Authority's rate structure. The classification of customers created by the Authority's rules and regulations is valid so long as the charge is uniform within the classification and is reasonably proportional to the service rendered. Patton-Ferguson, supra. Care must be taken by the reader to .avoid confusing the classification of customers into the two classes delineated above with the Authority's use of the terms "residential", "commercial", "municipal", etc., usage of which would indicate a classification. The challenged rates are not based upon whether a customer is characterized as residential or commercial, etc.

We must analyze first whether or not the charge is uniform within a classification. We conclude that the rules and regulations do not provide for a uniform charge for the class of customers whose properties to which water service is provided are designated as more than one "premise" and are served by one meter. The rules and regulations state that the average use of water for each "premise" will provide the basis for billing, and the amount of the charge for each "premises" will be computed on the basis of a five eighths-inch meter installation according to the minimum allowance in gallons and charge for a five eighths-inch meter on the applicable rate schedule. The authority retains the discretion, how-

ever, to apply a different minimum allowance and charge "[i]f it be determined that meters larger than five eighths-inch size would be necessary if each premises were provided with individual service . . . ." If such a determination were made, the charges for each premise would be based on the larger meters.

Although the parties agree and the evidence indicates that all single-metered multi-unit buildings have been charged according to the minimum charges and allowances for a five eighths-inch meter, the authority may apply the minimum charges and allowances applicable to a larger meter under the foregoing circumstances. The effect of the foregoing is that the Authority has the unrestricted discretion to change the method of billing among customers in the same class. The authority has retained the power to assess charges to members of the same class based on a formula which may be altered by the authority. The authority has the power to increase the size of the meter which will be used to determine the applicable minimum charge and allowance; no power exists to decrease the size of the meter which will be used for purposes of calculating the service charges. The rules and regulations permit the authority to treat individual members of the same class of customers differently.

The second issue is whether or not the service charge is reasonably proportional to the service rendered. The rates which are charged to a class of customers should generate revenues which are roughly proportional to the costs of serving the class. Prior to the adoption of the multiple minimum billing method in 1960, no study was done of the costs of providing service to single-metered multi-unit buildings; nor has any been conducted since.

The greater portion of the evidence presented during the trial involved the patterns of domestic water use by customers, whether the customers were owners of small or large residential properties or were owners of multi-unit apartment buildings. Emphasis was placed by both parties upon domestic water use because the customers of the authority's service area are predominantly residential users. Both parties introduced testimony and evidence that the demand characteristics of residential, commercial and industrial users varied greatly and that residential users influenced the peak demands, daily and seasonal, which affect the design of the plant facilities and distribution system. Both parties introduced testimony which would indicate that the peak time usage differs for residential, commercial and industrial users. Defendant's expert testified that the time of usage and the amount of usage affect the costs of the water system. A customer whose pattern of water use results in the use of water predominantly in a peak usage time, hour, day or seasonal, is more costly to serve than a customer whose water use is distributed among the hours, days or seasons. The testimony indicates that residential users typically use all of their water during the peak times and that commercial and industrial users do not.

The costs which were incurred by the authority for various fiscal years in operating the facilities and in producing the water service were introduced into evidence. The figures represent the actual costs to the authority of providing water service to all of its customers. The costs were allocated among the categories of users defined by the authority, but were not allocated between the customers, regardless of the type of use, who had a separate meter for each premise and the customers who had more than one premise and a single meter.

Plaintiffs argued that the authority "saves" on the expenses referred to as customer costs—e.g., the costs of reading meters, billing, and Maintenance—because the authority does not have to, inter alia, read meters, bill, and maintain service connections for each premise in a multi-unit building. Although plaintiffs refer to the cost difference as a cost "savings", no actual savings are made by the authority. The reality of the situation is that separate meters typically have not been utilized in multi-unit buildings; nor would the authority accommodate a change to separate meters. The use of the multiple minimum billing method treats each premise as if it were served by a separate five-eighths-inch meter, however, and to this extent the billing method does not recognize the cost difference, which does exist.

The evidence demonstrates that "premises", as defined, encompasses every type of user—residential, commercial, and industrial—who is not served by a separate meter for each premise. Neither the formula for multiple minimum billing nor the evidence demonstrates that the differences among the types of users who are billed according to the formula were considered in establishing the formula. The evidence establishes, however, that the costs of providing water service to residential, commercial and industrial users vary widely. Despite the differences, the Authority has established a rate structure which assesses charges to all types of users in the class of customers whose property is designated as more than one "premise" and is served by a single meter according to the charges for a five-eighths-inch size meter for each premise, regardless of the actual size of the meter. Under this billing formula, a customer with more than one premise served by a single meter is charged as if each premise were served by a five-eighths-inch

meter—regardless of whether the user is a residential, commercial, or industrial user.

. Although the representative plaintiffs are principally owners of apartment buildings, the multiple minimum billing method does not apply exclusively to the category of residential users. Any multi-unit building serviced by a single meter is charged according to the multiple minimum billing method—regardless of whether the user is a residential, commercial, or industrial user. It is the fact that the billing method does not take into account the differences among residential, commercial, and industrial users, which makes the rates which are charged to this class of customers unreasonably disproportionate to the service rendered.

The multiple minimum billing method was adopted by the Authority at the time of its inception in 1960 without establishing any relationship to the costs of providing service to members of the class of customers and has continued to be used to date without establishing any such relationship. The evidence demonstrates, however, that the costs of providing service to residential, commercial or industrial users are not the same, although the billing formula and the evidence indicates that the authority disregards the difference in the costs of serving the various types of users.[6] We find that the rates

---

6. It would appear that the authority implicitly recognized the cost differences in serving premises with different sizes of meters in that it retained discretion, as discussed supra, to charge each premise in a multi-unit building based on a larger meter if it was determined that meters larger than five-eighths-inch would be necessary if each premise were provided with individual service. The parties stipulated that the Authority computes its charge for water service to all multi-unit buildings in which one unit is served by a single meter

charged to the classes which were created by the authority's multiple minimum billing method are not uniform or reasonably or proportionally related to the service rendered by the authority. We find that the authority has abused its discretion in adopting the multiple minimum billing formula, set forth in the rules and regulations, which establishes a rate which is neither uniform within the classification nor reasonably proportional to the service rendered to the members of the class.

An order of court on the issue of liability only will be entered in favor of plaintiffs. Damages, attorneys' fees, costs and expenses will be determined at a hearing to be held as scheduled by the court.

## SCHEDULE OF RATES

A minimum charge will be made to each customer for each meter, allowing certain quantities of water without additional charges. The charges and minimum allowance are as follows:

| Size of Meter | Monthly Allowance In Gallons | Monthly Minimum Charge | Quarterly Allowance in Gallons | Quarterly Minimum Charge |
|---|---|---|---|---|
| 5/8" | 2,333 | $ 4.51 | 7,000 | $ 13.53 |
| 3/4" | 3,000 | 5.86 | 9,000 | 17.58 |
| 1" | 6,000 | 11.71 | 18,000 | 35.13 |
| 1¼" | 9,000 | 17.56 | 27,000 | 52.68 |
| 1½" | 13,000 | 25.36 | 39,000 | 76.08 |
| 2" | 24,000 | 46.83 | 72,000 | 140.49 |
| 3" | 55,000 | 107.29 | 165,000 | 321.87 |
| 4" | 93,000 | 181.41 | 279,000 | 544.23 |
| 6" | 141,000 | 275.06 | 423,000 | 825.18 |

ranging in size from one to six inches by multiplying the minimum charge and allowance for a five-eighths-inch meter by the number of premises. It is apparent that there has been no practical application of this principle.

Meter Quantity Charges—The following rates shall apply to all customers, the allowance of water for the above minimum charges to be deducted from the quantities shown below in the application of the rate schedule:

|          | Per Quarter | Per 1,000 Gallons |
|----------|------------:|------------------:|
| First    | 45,000     | $1.70             |
| Next     | 150,000    | 1.44              |
| Next     | 150,000    | 1.28              |
| Next     | 657,000    | 1.20              |
| All Over | 1,002,000  | 1.09              |

### PUBLIC FIRE PROTECTION—Hydrants

The annual rental on public fire hydrants shall be $35.00 per year, payable quarterly. There shall be no charge for installing a fire hydrant if it is installed at the time of construction of the main by the Authority. In the event a fire hydrant is installed subsequent to the installation of the main line, the municipality and/or others requesting the hydrant shall pay the complete installation cost thereof, including the hydrant, tee, valve, piping, fittings, blocking, drainage, restoration charges, permit fees and other costs. The maximum distance between hydrants shall not exceed 1,200 feet.

## APPENDIX A

## ORDER

And now, February 19, 1983, it is hereby ordered and decreed that the formula of charging for water services in all cases where more than one premise is served through one meter or a meter installation, contained in the Rules and Regulations Governing Water Services For All Service Areas, Section 1, 7

(1), (2), (3), (4), (pages 2 and 3) (effective date March 22, 1973) of the Municipal Authority of the Borough of West View, is deemed to be invalid.

The authority is directed to cease and desist from billing the representative plaintiffs and the members of the class pursuant to said formula. Until such time as the authority, if it so chooses, develops a different billing formula, it shall bill the representative plaintiffs and the members of the class according to the size of the meter, consistent with the present schedule of rates governing water service.

Further, it is hereby ordered that the matter of damages, attorneys' fees and costs and expenses shall abide until further hearing by this court.